Clark *v*. The J. R. Watkins Medical Company.

Opinion delivered November 2, 1914.

1. Contracts—rule of construction—duty of court.—Where the terms of a contract are unambiguous, it is the duty of the court to construe the contract, and to declare its purport.

2. Appeal and error—directed verdict—view of evidence on appeal.—Where a verdict was directed in favor of appellee in the circuit court, on appeal the evidence will be viewed in the light most favorable to appellant.

3. Principal and agent—doing business.—Where appellant went about from house to house selling his wares and delivering them to the purchasers thereof, at the time the sales were made, he will be held to be doing business within the State.

4. Principal and agent—relationship—question for jury.—Plaintiff, a Minnesota corporation, delivered goods to one C. in Arkansas, C. agreeing to make canvasses in a certain county for the sale of the same. *Held*, in an action by plaintiff against a surety on defendant's bond, that it was a question for the jury whether the relationship between plaintiff and C. was that of vendor and purchaser, or principal and agent.

5. Foreign corporations—doing business in the state—interstate commerce.—The act of 1907, p. 774, Act No. 313, known as the Wingo Act, does not apply to a foreign corporation engaged solely in interstate commerce, but it does apply, where a foreign corporation employs an agent who does business for it, within the State.

Appeal from Greene Circuit Court; *J. F. Gautney,* Judge; reversed.

STATEMENT BY THE COURT.

The appellee, a corporation organized under the laws of Minnesota and maintaining its principal place of business at Winona, in that State, brought suit against the appellants to recover the price of certain medicines and articles of merchandise furnished by it to them under the terms of a written contract.

Appellants, Virgil Clark and Isaac Davidson, entered into a written contract with appellee guaranteeing payment for the articles furnished their principal, Joe Clark, under his contract; hence the suit against them.

There was attached to the complaint the exhibits which constituted the contract between the parties upon which this suit was based. The first of these is a writing which has the caption, "Application for Agency." This application was dated the 3d of October, 1908, and contained answers to the various questions propounded to the applicant and, among others, the following answers were given, which, stated in narrative form, are. as follows: That applicant was a farmer, and had never previously canvassed for any one. That he spoke English, and could furnish the required references. That he was not incapacitated for hard labor, and could furnish a suitable team and wagon, and preferred to have territory assigned to him in the State of Arkansas, in which State his first choice of territory was the county of Independence and his second choice the county of Carroll, but that he would be willing to go to a distance for territory if none was vacant near him. That he could begin canvassing within fifteen or twenty days after the acceptance of his application, and that he would desire to run a time account and pay for goods furnished him, and would want the company to sell him a wagon on credit. This application contained the names of Virgil Clark and Isaac Davidson as names of parties applicant would expect to secure as bondsmen on his contract, if his application was accepted and, upon the acceptance of the application, they became his sureties and have been sued as such.

An agreement was executed between the parties, which bears date October 9, 1908, and which was made exhibit No. 2 to appellee's complaint. This contract recites that the J. R. Watkins Medical Company appoints Joe Clark as a traveling salesman for its products in the following described territory, and no other, namely: In the State of Arkansas, County of Independence; and further that the J. R. Watkins Medical Company agrees to furnish its products f. o. b. cars at place of shipment, to said traveling salesman above mentioned, at such times and in such reasonable quantities as he may order, to be charged to him in accordance with the company's printed price list current, during the term of this contract, which is to be considered a part thereof. That the medicine company promises and agrees to take back all goods left in the possession of the traveling salesman at the time he quits work and to give credit for same at the prices originally charged, provided said goods are returned to the company by prepaid freight and are in the same condition as when shipped, otherwise a reasonable charge will be made for putting such goods into merchantable condition. That if, at the expiration of the service of such traveling salesman, there should be any sum due him by said medical company, the said company agrees to immediately pay the amount so due in cash and, at the expiration of this contract, the medical company agrees to make a new contract with said traveling salesman without requiring his account to be paid in full at that time, provided the amount of his business and the conduct of the same has been satisfactory to the company. That the traveling salesman, for his part, promises to faithfully perform each and all of the agreements printed on the back of this contract. That the contract is not transferable and expires by limitation March 1, 1910. This contract was signed as follows: "The J. R. Watkins Medical Company, by Paul Watkins, Vice President. (Traveling salesman sign here in ink.) Joe Clark."

The following obligation of the sureties was endorsed upon said writing:

"For and in consideration of the appointment of the above mentioned traveling salesman, we hereby agree to be jointly and severally responsible to said The J. R. Watkins Medical Company for the faithful performance of this contract on the part of said traveling salesman as outlined on the back of this agreement."

After the signatures of the sureties there appears the following statement in parentheses:

"The above mentioned sureties are entitled, upon request, at any time, to a full statement from the traveling salesman's register showing the exact condition of the business."

Among the agreements printed on the back of the contract were the following:

"How the products of the J. R. Watkins Medical Company are to be paid for by the traveling salesman. It is agreed that the traveling salesman shall have the choice of two methods of paying for the products of The J. R. Watkins Medical Company under this contract: First, he may run an open account with the company, all products to be charged in accordance with the regular traveling salesman's price list before referred to, and the account to be paid by remitting to the company each week as per its weekly report blanks. Second, he may pay cash within ten days from date of bill for said products, and thus obtain a discount of 3 per cent. from said price list, it being understood that no bill can be discounted while the traveling salesman is still in debt to the company for goods previously furnished him. As a guarantee of good faith, it is necessary for the traveling salesman to furnish sureties on either method of payment and to report each week on the blanks furnished by the company."

And there was also a statement of various agreements on the part of the traveling salesman and, among others, the following:

"To devote all of my time and attention to personally selling and disposing of the products of The J. R. Watkins Medical Company to actual consumers only in

my territory, at retail prices to be indicated by the company, making a personal canvass of every farm house at least twice a year, or oftener, if advisable; having no other occupation, and selling or handling no other goods whatever; to furnish and maintain at my own expense a suitable team; to pay transportation charges on the goods shipped to me; to begin work as soon as practicable after goods are received and to work continuously at the agency as far as weather and health will permit, observing such instructions in regard to the conduct of the business as may be given me by the company from time to time; to pay all of my expenses on the road and stand the loss, if any, of breakage and of accounts made by me with customers; to make regular and satisfactory reports and pay for the goods furnished me according to one or the other of the methods of payment provided for on the back of the contract; to terminate my services upon written notice to do so in case of my violation of this contract or in the event of my failure to do a satisfactory business under this agreement; to return to the medical company, by prepaid freight, all goods furnished by it in my possession at the time I quit work, receiving credit for the same as provided for on the face of this contract, and to immediately pay in cash any balance that I may be then owing the company according to its books. (Signed) Joe Clark, Traveling Salesman.''

A second agreement was entered into between the parties, which was also made an exhibit to the complaint and which reads as follows:

''This agreement, made at Winona, Minnesota, U. S. A., this 1st day of December, A. D. 1909, between The J. R. Watkins Medical Company, a corporation, hereinafter called the Company, party of the first part, and Joe Clark, of Batesville, Ark., party of the second part,

''Witnesseth, That for and in consideration of the promises and agreements hereinafter contained, to be kept and performed by the party of the second part, the Company promises and agrees to sell and deliver to the party of the second part, free on board cars, at Winona

Minnesota, or at its option, at any of its regular places of shipment, any and all medicines, extracts and other articles manufactured or sold, or which may hereafter be manufactured or sold by it at the usual and customary wholesale prices, as shown by the Company's wholesale printed price list, as the party of the second part may reasonably require for sale by him at the regular retail prices from time to time, from the date hereof until the first day of March, 1911, when this agreement shall terminate; in the following described territory, excepting the incorporated municipalities therein located, towit: In the State of Arkansas, Independence County.

"In consideration of the sale and delivery to him free on board cars at Winona, Minnesota, or other shipping point as above mentioned by said Company, of the medicines, extracts and other articles manufactured or sold by it, in such reasonable quantities as he may require for sale in said territory at the regular retail prices as hereinbefore provided, the party of the second part promises and agrees, as soon as practicable after said medicines, extracts and other articles are received, to devote the whole of his time and attention to making a diligent, continuous and personal canvass of said territory, and to visit every farm house therein at least twice a year, at his own cost and expense and provide a good team and proper wagon and outfit therefor, and sell at the regular retail prices, aforesaid, said medicines, extracts and other articles, or so much thereof, at each of said houses, to actual consumers in the above mentioned territory, as possible, and at all times during said term, said party of the second part agrees to keep a complete record of all goods disposed of by him in his said territory, and on hand, and to make to said Company regular weekly written reports of the sales and collections, and also report the goods on hand and outstanding accounts when required by said Company so to do.

"And the party of the second part promises and agrees to pay to said Company, at Winona, Minnesota,

the wholesale prices, aforesaid, for the medicines, extracts and other articles sold to him from time to time, as hereinbefore provided, at the time and in the manner and in accordance with the provisions of the weekly report blanks of said Company furnished to the party of the second part, or in cash, within ten days from date of invoice, with the understanding that said Company will allow a discount of three per cent. from said wholesale prices on cash payments, provided full payment for all goods previously furnished shall then have been made; but such payments, or any of them, may be extended by the said Company without notice to the sureties hereon or without prejudice to the rights or interests of said Company; and if the party of the second part shall not pay cash for said medicines, extracts and other articles so sold and delivered to him, and become indebted to said Company therefor, and such indebtedness is allowed to continue unpaid, said Company may in its discretion, thereafter either limit the sales herein agreed to be made, or discontinue the same until such indebtedness is paid or reduced as said Company may require, and at the termination of this agreement, the party of the second part agrees to return by prepaid freight to said Company, at Winona, Minnesota, in as good condition as when furnished to him, all of the said medicines, extracts and other articles undisposed of by him in his said territory and said Company agrees to receive such medicines, extracts and other articles as above provided, at the original prices at which the same were sold to him, and credit the party of the second part therefor, less a reasonable sum for putting the same or any part thereof in a salable condition if the same are not in such condition when so returned, and if there is any sum then due from either of the parties to the other, the same shall be due and payable on demand of the party to whom such sum is due.

"And it is mutually agreed between the parties hereto, that the party of the second part shall sell no other goods or articles during the term of this agreement, except those purchased by him from said Company,

as aforesaid, that he shall pay all transportation charges on goods he so purchases and all expenses and obligations incurred in connection with the canvass of said territory and the sale of the goods therein, and shall have no power or authority to incur any debt, obligation or liability of any kind whatsoever, in the name of, or for, or on account of, said Company, and that said Company shall in no way contribute to the expense of, nor share in the profits of such sales. The balance due at the date of this agreement from the party of the second part to the party of the first part for goods sold and delivered to him free on board cars at Winona, Minnesota, under a prior agreement, is hereby mutually agreed to be the sum of six hundred twelve and 10/100 dollars, which sum the second party hereby promises and agrees to pay during the term of this agreement. And if the party of the second part shall fail to perform any of the conditions herein contained, required of him to be performed, at the time and in the manner as herein provided, the said Company may, at its option, upon such failure terminate this agreement, by giving said second party written notice thereof by mail, and any sum then owing from said second party to said Company shall thereupon be and become immediately due and payable.

"In Witness Whereof, The party of the first part has caused these presents to be executed in its corporate name by its proper officer, and the said party of the second part has hereunto set his hand the day and year above written.

"The J. R. Watkins Medical Company,
            "By Paul Watkins, Vice President.
    "Party of the second part sign here in ink)
                            "Joe Clark.

"In consideration of one dollar in hand paid, the receipt whereof is hereby acknowledged, and of the execution of the foregoing agreement by the J. R. Watkins Medical Company, and the sale and delivery by it to the party of the second part, of its medicines, extracts and

other articles and the extension of the time of payment of the amount due from him to said Company, as therein provided, we, the undersigned, jointly and severally guarantee the full and complete payment of said sum and of said medicines, extracts and other articles, at the time and place, and in the manner in said agreement provided.

"(Responsible sureties sign here, business men preferred. Sign in ink). Virgil Clark; Occupation, general merchandise; P. O. address, Delaplaine, Ark. Isaac Davidson; Occupation, farmer; P. O. Address, Paragould, Ark.

"Note—At the expiration of this agreement the Company will be willing to make a new agreement with the party of the second part, provided the amount of his business and the conduct of the same under this agreement shall have been satisfactory to the Company."

These exhibits are all on printed forms furnished by appellee.

There appears to have been no controversy as to the quantity or price of the goods furnished appellant Joe Clark under the terms of these contracts, nor as to the amount of goods returned by him and the consequent balance which he would owe.

There was introduced in evidence copies of advertisements prepared by appellee to promote the sales of its salesmen, reference to which will be made in the body of the opinion, where additional facts will also be stated.

It was admitted that appellee had not complied with the provisions of Act No. 313 of the Acts of 1907, page 744, commonly known as the Wingo Act, and entitled "An Act to permit foreign corporations to do business in Arkansas, and fixing the fees to be paid by all corporations."

Appellants asked various instructions and, among others, the following:

"3. If the jury find from the evidence that plaintiff has been doing business in the State of Arkansas dur-

ing the years 1909, 1910, 1911, and 1912, and that the contract sued on in this case was made in this State, then your verdict will be for the defendants.''

The court refused this and all of the other instructions requested by appellants and directed the jury to return a verdict for the amount sued for, which was done, and this appeal has been duly prosecuted from the judgment pronounced thereon.

*R. E. L. Johnson* and *George A. Burr,* for appellants.

1. It was error to direct a verdict; the case should have been submitted to a jury. 93 Ark. 191.

2. Appellee was a foreign corporation, and never having complied with the Wingo Act (Laws 1907, p. 744) can not enforce the contract in suit. This act is valid. 158 S. W. 497. It certainly did ''business'' in this State. 90 Ark. 73. Clark was simply an ''agent,'' not a ''vendee.'' 150 U. S. 312; 100 S. W. 558; 141 U. S. 627; 150 *Id.* 312; 100 S. W. 558; 151 *Id.* 211; 98 Tenn. 221; 74 C. C. A. 611.

*R. P. Taylor,* for appellee.

1. If Clark was an agent, appellee has a right to recover. He was only a means or instrumentality in carrying on interstate commerce. 57 Ark. 24; 217 U. S. 91; 141 *Id.* 47; 187 *Id.* 632; 119 Pac. 630; 156 Fed. 2; 115 N. W. 829; 12 Wheat. (U. S.) 419; 227 U. S. 389; 102 N. W. 888.

2. It was not doing business in the State within the meaning of the act. 2 A. & E. Ann. Cas. 309; 161 Fed. 223; 18 L. R. A. (N. S.) 139; 105 S. W. 971; 18 L. R. A. (N. S.) 140; 40 S. W. 393, 714; 54 *Id.* 425. The relation of Clark was not that of an agent. He was a purchaser on his own account for the purpose of selling at a profit. L. R. Chy. App. Cas. 397; 98 Tenn. 244. This was a case of absolute sale. The contract and business constituted interstate commerce. 163 S. W. 662.

SMITH, J., (after stating the facts). Section 2 of the Wingo Act prescribes a fine against any foreign corporation doing business in this State

which shall fail and refuse to file its articles of incorporation, together with a statement of its assets and liabilities and its capital employed in this State, and a designation of its principal place of business in this State, or which shall fail to file the certificate of its board of directors consenting that service of process upon any agent of such corporation in this State, or upon the Secretary of State of this State, in any action brought or pending in this State, shall be a valid service, and, as an additional penalty, provides that such corporation can not make any contract in this State which can be enforced by it either in law or in equity. Notwithstanding the fact that the third section of the Wingo Act, which attempts to impose upon foreign corporations, as a prerequisite to doing interstate business, the payment of certain fees, based upon the amount of their capital stock, has been held invalid, the first section of this act has been held valid. This first section provides for the filing of the certificates above mentioned. *Roberts* v. *Chatwin,* 108 Ark. 562, 158 S. W. 497.

Appellee admits that it has not complied with the terms of the Wingo Act, but says that it was not required to do so in order to maintain this suit, its position being that the contract exhibited constituted a sale of goods and that the character of the transaction as a sale is not altered by the fact that it imposed certain conditions upon purchasers of its goods, as a prerequisite to the sale of the goods, and it says that the correspondence and the literature emanating from it, which will be later referred to, concerning the conduct of appellant Clark's sales to consumers were mere suggestions which from experience it had found would be helpful to its vendees in disposing of their wares.

(1) In executing the contracts sued on, appellant signed printed contracts, which had been prepared for that purpose by appellee, and the rule is that such contracts are to be construed most strongly against the party preparing them. In construing a contract we may consider the construction which the parties themselves

have placed upon it and the action they have taken in executing its provisions. These rules of construction, however, are not available where the terms of the contract are unambiguous. Where the terms of the contract are unambiguous, it is the province of the court to construe the contract and to declare its purport; and appellee insists that that duty here devolved upon the trial court, and that that court correctly construed the contract as one of sale, and not as a mere appointment of an agent.

Counsel have cited and reviewed a great many cases; but there appears to be no necessity to review these cases in this opinion. It is clear that, if the contract between the parties constitutes a sale of the commodities there mentioned, there can be no doubt that the court correctly directed a verdict in favor of appellee. But the evidence upon that question is not so undisputed that it may be said, as a matter of law, that the contract constituted a sale of goods, and not an agency.

(2) The verdict having been directed in favor of appellee, it is our duty to take that view of the evidence which is most favorable to appellants and if, when it has been viewed in the light most favorable to them, it would justify a reasonable mind to fairly draw the inference from the evidence that the relationship between the parties was that of principal and agent, then the sufficiency of the evidence to sustain that view should have been submitted to the jury for its consideration.

Numerous letters, both personal and circular, together with various advertisements, sent out by appellee, have been offered in evidence and, without setting out all of this matter, it is sufficient to say that from it, in connection with the contracts themselves, the jury might have found the following state of facts: That the first contract executed by the parties appointed Joe Clark to an agency until March 1, 1910, and the second continued him in that capacity for another year. That these contracts required Joe Clark to devote all his time and attention to selling Watkins' products; to canvass every farm house in his territory at least twice a year; to sell

these products at retail prices fixed by the company; to confine his canvassing to his own territory; to observe such instructions in regard to the conduct of the business as the company might give; to have no other occupation whatever and to sell or handle no other goods whatsoever; to work continuously at the agency so far as weather and health will permit; to furnish team, wagon and outfit for the business; to pay freight on the goods; and to make regular and satisfactory weekly reports to the company; to pay for the goods in one or the other of the ways provided therein; to return all goods by prepaid freight to the company when he quits the business, for credit on his account; to make written reports to the company of all sales, collections, goods on hand; and outstanding accounts; to sell only to actual consumers; and to keep a complete record of all goods disposed of in said territory. That the company agreed to let him pay for the goods by giving it half of the cash the agency produced each week, or by paying cash for goods within ten days, with 3 per cent discount; and when he quit work, the company agreed to receive all goods on hand (to be returned by prepaid freight) and give him credit on his account at the original price paid for them; and, when a balance was struck, the party who owed the other should pay, on demand, such balance due.

The record contains letters in which appellee expressed its dissatisfaction with appellant Joe Clark's success in selling the goods, and he was urged in these letters to press his credit sales, and was advised to make sales at every house, and the assurance was contained in these letters that this was the plan through which other agents had succeeded in making money. And on November 1, 1909, appellee wrote a letter containing the following statements: "We regret that your business is not satisfactory to us, and the next few weeks are going to decide whether we retain you as an agent or not. Therefore you will have to show us very soon that you can do business that will be satisfactory to us, otherwise we shall notify your bondsmen and demand a settlement

of your account in full by the time of expiration of your contract on March 1, 1910." On February 3, 1910, a letter was written in which it was stated: "It is time now to be building up accounts with your customers and getting ready for the big collection season that comes in the fall. We want you to get around and supply the needs of everyone in your county. See that no one puts you off without a sale." Other letters were written in which they asked appellant Joe Clark to assist in securing agents for certain counties in this State where no agents were operating.

It appears that the indebtedness for which this suit was brought grew out of these credit sales which appellant Clark had made, as he appears to have acted upon appellee's advice to press his credit sales, but to have been unable to make collections covering such sales.

(3) There can be no question but that appellant Clark was doing business in this State. *Simmons-Burks Clo. Co.* v. *Linton,* 90 Ark. 73. It is undisputed that he went about from house to house and sold his wares and delivered them to the purchasers at the time the sales were made. But was this a business conducted by Clark for himself, or was it a business which he was conducting for appellee? We think the evidence raises this question of fact and that it should have been submitted to the jury.

We are cited to the case of *J. R. Watkins Medical Co.* v. *Holloway* (Mo.), 168 S. W. 290, which was a suit upon a contract identical in every respect with the second contract set out in the statement of facts. In that case the court recites the facts to be that the goods were sold by a citizen of Minnesota, who was the plaintiff, to a citizen of the State of Missouri, who was the defendant, and that the sale was complete upon the delivery of the goods f. o. b. Winona, Minnesota, and that nothing remained to be done under the contract after the goods were placed on cars in Winona, except to pay for them, and that these payments were remitted to Winona; that payment was

to be in money in case the goods were sold, or by allowing credit for the value of any goods returned, but that all of the goods were, in fact, sold and none were ever returned.  That no office of any kind was ever maintained in Missouri by the plaintiff, nor did it retain any lien on or attempt to reserve any title to the goods from the moment they went aboard cars in Winona; that the goods became the property of the defendant as soon as they were delivered to the carrier, and that the defendant paid the freight and, so far as the evidence showed, exercised complete control and ownership over the merchandise as soon as delivered by the plaintiff.  In the suit for the goods there furnished it was contended that no recovery could be had because the defendant had acquired the goods in violation of certain sections of an act of the General Assembly of that State concerning pools, trusts, conspiracies, and discriminations, found in chapter 98 of the Revised Statutes of Missouri of 1909, and that the contract there set out should be construed as a contract of agency as between the parties and that the plaintiff, therefore, could not maintain this suit, as it had never taken out a license to do business in Missouri as a foreign corporation.  The court reviewed a great many cases and its conclusion, as stated in the syllabus of that case, was as follows:

"Plaintiff, a Minnesota corporation, entered into a contract with defendant, a resident of Missouri, whereby it agreed to sell and deliver in Minnesota, or any of its regular places of shipment, certain medicines and extracts, to be paid for at the usual wholesale prices, and to be delivered when required by defendant.  The contract further required defendant to make regular canvasses in a specified county for the sale of such medicines and extracts, and forbade him to sell any others.  All deliveries of medicines and extracts were made without the State of Missouri. *Held,* that as plaintiff reserved no title to the property sold, and merely gave defendant the option of returning it, the contract constituted 'interstate commerce,' and hence was not governed by the

Missouri anti-trust laws, and plaintiff's right to sue can not be defeated, because, though a foreign corporation, it had not procured license to do business in Missouri, as required by Rev. St. 1909, § 3040.''

' The court there found that the evidence did not establish the existence of an agency, but that the relationship of the parties was that of vendor and vendee, and, having so found the facts to be, its decision that the shipment and sales of the goods was an act of interstate commerce was, of course, correct, and it necessarily followed that this commerce was not subject to the restrictions and regulations of the statutes of that State.

In the opinion in this Missouri case the court cites the case of *Orr's Admr.* v. *Orr,* 163 S. W. 757, and distinguishes the case there decided from the Orr case and, having made this distinction between the two cases, concedes the correctness of the decision in the Orr case under the facts as stated in that opinion.

The litigation in this Orr case grew out of a contract made with this J. R. Watkins Medical Company, and, while the contract is not set out *in extenso* in that case, it is fair to assume that it was evidenced in part by the same writing set out in this opinion and in the Missouri case. The facts there were that one Nance was the traveling salesman of the medicine company, with territory restricted to Montgomery County, in the State of Tennessee, and that, after having been engaged in the service of that company for some months, he became indebted to it in the sum of $668.01 on account of articles which he had sold on credit, but for which he had been unable to collect, and that in settlement of this balance he executed a note to the medical company, together with E. O. Orr and J. W. Orr as joint makers, and later this note was renewed by them, and the interest paid, both the original and renewal notes being dated at Winona, Minnesota, and payable at that point. In the suit on that note it was proved that, under the statutes of Tennessee, every foreign corporation is required to file a copy of its charter with the Secretary of State, and

that it is unlawful for any such corporation to do, or attempt to do, any business in the State until it had complied with that statute, and that it had been uniformly held by the Supreme Court of Tennessee that, where a foreign corporation does business in that State without complying with the statute, all contracts growing out of such business are illegal and void; and it was also shown that the medical company had not complied with the statute. In the opinion of the court there is a statement of various things which Nance did pursuant to his contract with the medicine company, together with a statement of a number of the provisions of the contract and of the recitals on its back, all of which are also found in the record in the present case. A recovery was there denied because of the failure of the medical company to comply with the statute of Tennessee permitting foreign corporations to do business there, and in that connection the court said:

"Considering these facts and others which might be mentioned, there is no escape from the conclusion that appellant was doing business in Tennessee, and that Nance was not a mere purchaser of its products, but represented it as its agent. Nor is there any merit in appellant's plea that the transaction out of which the debt arose was interstate commerce, and that the note was binding, although the appellant had not complied with the laws of Tennessee. These products were not ordered by mail and shipped direct to its customers. As a matter of fact, they were shipped to Memphis, and from there distributed to its agent. Nance and his brother say that he never ordered any goods except from Memphis. Appellant's witnesses say that the goods were billed to Nance in Minnesota, and were merely sent to Memphis for distribution. Even if there be any doubt as to whether or not the interstate journey ended at Memphis, the interstate journey certainly ended when the goods were delivered to Nance. Upon their delivery to Nance their interstate character ceased. From that time on, Nance, as appellant's agent, proceeded to sell and de-

liver the goods in Tennessee. Under the facts, the defense of interstate commerce is not available.''

(5)   It appears that the Supreme Court of Kentucky held, under the facts recited in its opinion, that Nance was not a mere purchaser of goods from the medicine company but that he represented it as its agent; and, from the facts stated in the Missouri opinion, that court was of opinion that the relation of the litigants there was that of vendor and vendee and we think there is no necessary conflict between these cases, as the proof was more fully developed in the Kentucky case than in the Missouri case. So in the case we now have under consideration: The facts and circumstances in evidence are not necessarily inconsistent with the view that the relationship between the medicine company and Joe Clark may have been that of vendor and vendee; neither, on the other hand, are they necessarily inconsistent with the view that Clark was the mere agent of that company, and as reasonable minds might fairly draw different conclusions from this evidence, we think this question should be passed upon by the jury as one of fact, rather than by us, or by the trial court, as one of law. If Joe Clark was a mere purchaser of these goods from the medicine company, that company's right to recover can not be defeated by any failure on its part to comply with the Wingo Act, as such a requirement would impose a burden upon interstate commerce; and there can be no question, as a matter of law, that it would be an act of interstate commerce if this was a sale. Upon the other hand, if Clark was the agent of the medicine company, then this contract is within the terms of the Wingo Act, for it is not denied that the consignments of freight were broken up by him when he received them and that he placed his wares in his wagon and went about from place to place delivering the goods whenever he made a sale.

The judgment will be reversed and the case remanded to the court, with directions to submit this question of agency to the jury with directions to return a verdict for the appellees if they find the relationship

between the litigants was that of vendor and vendee, rather than that of principal and agent.

KIRBY, J., dissents.