LINOGRAPH COMPANY *v.* LOGAN.

Opinion delivered October 31, 1927.

1. COMMERCE—FOREIGN CORPORATION DOING BUSINESS WITHIN THE STATE.—Where a foreign corporation shipped a typesetting machine into the State to its own order for delivery to a resident buyer under an agreement of sale consummated without the State, the transaction was *held* to be interstate commerce and not a doing business within the State, so that the corporation was not under the necessity of complying with the State laws with reference to doing business within the State before it could bring suit for balance of the purchase money.

2. CORPORATIONS—FOREIGN CORPORATION DOING BUSINESS WITHIN THE STATE.—The preparation and delivery by a bank within the State, under the seller's orders, of notes, chattel mortgage, landlord's waiver of lien, insurance, bill of sale, and bill of lading, pursuant to an agreement between the buyer and seller for the sale of a typesetting machine which was consummated outside of the State, *held* a mere incident to an interstate transaction, and the seller did not thereby do business within the State, within the laws requiring compliance by foreign corporations in order to do business in the State.

Appeal from Johnson Chancery Court; *W. E. Atkinson,* Chancellor; reversed.

*Hugh Basham,* for appellant.

*Paul McKennon,* for appellee.

SMITH, J. The appellant, the Linograph Company, a foreign corporation, hereinafter referred to as the "company," brought this suit in the Johnson Chancery Court to recover $2,149.50, the balance of the purchase

money due on a type-setting machine, and to foreclose the chattel mortgage given to secure the debt. The complaint alleged that the purchase money was evidenced by one note for $30 and the balance in notes for $40 each, all dated December 3, 1923.

Appellees, who were defendants below, defended upon the ground that appellant was a foreign corporation, and had not complied with the laws of this State permitting it to transact business in this State, which contention was sustained by the court below, and the complaint was dismissed for that reason, and this appeal is from that decree.

The negotiations which led to the sale of the machine were conducted by letters and telegrams. The first of these was a letter dated Clarksville, Arkansas, December 1, 1923, written by S. H. Logan to the company at its office in Davenport, Iowa, in which he advised the company that he was in the market for a type-setting machine. On December 4 the company replied to this letter, advising that it had a second-hand machine at Cambridge Springs, Pa., which it would like to sell at what it said was a bargain price. Logan made several offers, all evidenced by letters, which were offered in evidence. After these letters were written several telegrams were exchanged, and on December 13, 1923, the company wired Logan as follows:

"Price Pennsylvania machine three magazines and eight-point, ten-point and twelve-point matrices and motor, twenty-five hundred dollars F. O. B. Cambridge Springs, Pa., complete as quoted our letter December 4, terms one hundred fifty cash balance forty monthly as stated our wire December 12th. Installation charges thirty-five dollars for railroad fare plus hotel and living expenses. Man will stay five days. Request remittance of cash payment as evidence of good faith. Otherwise if you should change your mind after shipment we would have to return and pay charges. Machines will be overhauled and guaranteed in good condition. Our guaranty is good. Have delayed removal one day. Wire cash Friday or we

must ship elsewhere. Same equipment new would cost over thirty-seven hundred fifty."

On December 14 Logan wired the company as follows:

"Am wiring you one hundred fifty dollars with the understanding that the machine is to be shipped immediately and that I am to get a man with Linograph experience to install it. He can install it I am sure and save me the expense of a man from your factory. Machine must be shipped at once."

In reply to this telegram Logan wired the company, on the date of its receipt, to the effect that he was ready to pay the $150 if the company would make a concession in regard to the number and time of payments of the notes which would evidence the unpaid balance.

On the same date the company wired Logan the following reply to the last mentioned telegram: "Price and terms previously stated twenty-five hundred dollars, terms $150 cash, forty monthly installation by our man to insure you get proper start. Wire cash or refusal today."

Logan wired the $150 to the company on the following day (December 15, 1923), to which the company replied, as follows: "Cash received. Expert now overhauling machine. Shipment next week. Forwarding contract for your signature."

In other correspondence Logan advised he wished the contract closed through the Farmers' National Bank of Clarksville, Arkansas, and in response to this request the company wrote the following letter:

"Davenport, Iowa, January 4, 1924.
"Farmers' National Bank,
Clarksville, Arkansas.

"Gentlemen: We inclose herewith the following papers in connection with the sale of a linograph to Mr. S. H. Logan of your city:

"Chattel mortgage in duplicate, fifty-nine promissory notes, bill of lading, bill of sale, copy of invoice, landlord's waiver of lien, loss payable insurance clause.

"Please notify Mr. Logan when these papers arrive and request that he call and execute them.

"Do not hand over the bill of lading before the following instructions have been carried out:

"(1). Have both copies of mortgage signed and acknowledged before a notary public, and two witnesses. (2). Have all blanks for dates and other blanks in mortgage filled in. (3). Have all the notes signed. (4). Have a two-cent revenue stamp placed upon each note, canceling same, the cost of which is to be paid by our customer. (5). Have the machine insured for $2,400. Have the loss payable clause in our favor attached to the policy. Send the policy to us with the other papers. The premium is to be paid by Mr. Logan. (6). Have the landlord's waiver of lien signed by the owner of the building, if our customer is not the owner. (7). When all papers have been properly executed, turn the bill of lading and bill of sale over to our customer. (8). Have the mortgage recorded at the office of the county recorder. Request that evidence of recording be placed on both copies. (9). When the mortgage is returned from the county recorder's office, with evidence of recording on copies, return all papers to us. (10). Bill us for your services.

"Thanking you for giving this matter your prompt attention, we are,

"Yours very truly,

"The Linograph Company

"E. S. Larson, Accounting Dept."

It will be observed that the date of this letter is January 4, 1924, but, before it was written, Logan had signed an order dated 12-19-23 for the machine, which was submitted to and accepted by the company at its office in Davenport, Iowa, under date 12-24-1923, in which he agreed to do, as part of the contract of sale, all the things set out above. All the requirements of this letter were met, and the bank delivered to Logan the bill of lading for the machine, which had been shipped by the company to its own order, and, upon surrender of the

bill of lading by Logan to the carrier having custody of the machine, it was delivered to him.   The bank returned the papers to the company, as directed in the letter set out above, and advised that its charges for this service was $1.50, and check to cover was sent by the company to the bank.

Logan testified he put the machine up and used it from the "jump go," and that it later proved defective, and the company sent a mechanic to make adjustments. The testimony in regard to the defects which developed need not be considered here, as the decision of the court below was based solely upon the theory that the appellant had made the sale in violation of the laws of this State by doing business in this State without having complied with the laws of the State permitting it to do business here, and was not entitled to recover on that account.

Logan assigned the contract to Hunter and Bost, who assumed payment of the unpaid notes, with the consent of the company, but they defaulted in the payments, and this suit was brought against them and Logan for the balance due on the notes and to foreclose the mortgage securing their payment.

This court has had occasion frequently and recently to determine when and under what circumstances a foreign corporation would be held to be engaged in business in this State, but we think it unnecessary to review these cases.   Among others are the following: *Scruggs* v. *Scottish Mortgage Co.*, 54 Ark. 566, 16 S. W. 563; *Gunn* v. *White Sewing Machine Co.*, 57 Ark. 24, 20 S. W. 591, 18 L. R. A. 206, 38 Am. St. Rep. 223; *Florsheim Bros. D. G. Co.* v. *Lester*, 60 Ark. 120, 29 S. W. 34, 27 L. R. A. 505, 46 Am. St. Rep. 162; *Sunny South Lumber Co.* v. *Neimeyer Lbr. Co.*, 63 Ark. 268, 38 S. W. 902; *Simmons-Burk Clothing Co.* v. *Linton*, 90 Ark. 73, 117 S. W. 775; *Clark* v. *J. R. Watkins Medical Co.*, 115 Ark. 166, 171 S. W. 136; *Hogan* v. *Intertype Corporation*, 136 Ark. 52, 206 S. W. 58; *Coblentz & Logsdon* v. *L. D. Powell Co.*, 148 Ark. 151, 229 S. W. 25; *Rose City Bottling Co.* v. *Godchaux*, 151

Ark. 269, 236 S. W. 825; *L. D. Powell Co.* v. *Roundtree,* 157 Ark. 121, 247 S. W. 389, 30 A. L. R. 414; *Kansas City Steel Co.* v. *State,* 161 Ark. 487, 256 S. W. 845.

In support of the decree of the court below, appellee cites and relies upon the cases of *Kansas City Structural Steel Co.* v. *State, use of Ashley County,* 161 Ark. 487, 256 S. W. 845, and the case of *Hogan* v. *Intertype Co.,* 136 Ark. 52, 206 S. W. 58, and it is argued that the latter case is practically identical with the instant case.

We think, however, that the cases relied upon are clearly distinguishable on the facts from the instant case. In the Hogan case the facts were that the type-setting machine was shipped into this State by the foreign corporation to itself, and that it remained the corporation's property after its arrival in this State until, by demonstration, it was found to be suitable to the purpose of the purchaser and was accepted, after which, and not until then, was the sale completed and the machine delivered. This important fact was emphasized by the statement in the opinion of the court that "one test laid down by the Arkansas cases differentiating an interstate transaction from an intrastate transaction is the ownership of the property after it arrives within the State" (citing cases), * * * and that "an interstate transaction contemplates a consignor without and a consignee within a State, or *vice versa.*"

Under both these tests the transaction here under review was an act of interstate commerce.

It is true the consignor made certain requirements set out in the letter from the company to the bank, copied above, before the delivery of the bill of lading, but those were mere incidents to the transaction which had been previously agreed upon, and evidenced by the written order for the machine, which had been accepted by the company at its office in Davenport, Iowa.

The other case relied upon by appellee to support the decree of the court below is that of *Kansas City Structural Steel Co.* v. *State, supra.* In that case, however, a foreign corporation had entered into a contract

to construct a bridge in this State and had later sublet a portion of the contract, and, to enable its subcontractor to comply with the subcontract, had accumulated and stored in this State the material which would be required for that purpose and which it proposed to sell to its sub-contractor as the materials were needed, and, under those circumstances, we held that the foreign corporation was doing business in this State, but, in so holding, the writer of that opinion took occasion to say, ''but this is not the case on the facts of a resident of this State ordering goods of a foreign corporation and the ship-ment of these goods by the foreign corporation to its own order in this State for delivery to the purchaser.''

The instant case, however, is one of a resident of this State ordering goods of a foreign corporation and the shipment of those goods by the foreign corporation to its own order in this State for delivery to the pur-chaser.

The case from which we have just quoted cited and approved the prior decision of this court in the case of *Rose City Bottling Works* v. *Godchaux Sugars,* 151 Ark. 269, 236 S. W. 825, and *L. D. Powell Co.* v. *Roundtree,* 157 Ark. 121, 247 S. W. 389, 30 A. L. R. 414, and we think the instant case is governed by them.

In the first of those cases the facts were as follows: A broker residing in Little Rock had taken the order of a resident of that city for a car of sugar, which was submitted to and accepted by a foreign corporation at its office in New Orleans. The sugar was shipped to ship-per's order, but the purchaser was unable to make the payment required to take up the bill of lading, and it thereupon became necessary for the parties to enter into a new contract which was made in this State for the delivery of the sugar to the purchaser. By this contract it was agreed that the broker, as the shipper's agent, should retain possession of the sugar, and he unloaded it and stored it in his warehouse in Little Rock. It was further agreed that the purchaser should have sixty days in which to complete the purchase, during which time

partial deliveries of the sugar were to be made him in this city and payment therefor being made at the price stipulated in the original contract, the purchaser in the meantime paying all freight, demurrage and storage charges and interest at six per cent., and, in addition, the purchaser agreed to and did execute a bond, which the broker approved in this State, conditioned upon the faithful performance of the new contract executed after the purchaser had made default.

It was there very earnestly insisted that the transaction constituted doing business in this State, but, in holding against that contention, we said:

"The sugar was, as before stated, consigned to shipper's order at Little Rock. This constituted a reservation of the title as security for the purchase price. It will scarcely be contended that the delivery of the bills of lading upon the payment of the draft would change the nature of the transaction so as to transform it into an intrastate rather than an interstate incident. If such were the law, it would circumscribe business carried on between citizens of different States within such narrow limits that it could scarcely be transacted without changing the whole nature of the transaction. The contrary is well established as the law on the subject. *Norfolk & Western Ry. Co.* v. *Sims,* 191 U. S. 441, 24 S. Ct. 151, 48 L. ed. 254. If therefore the goods came into the State under shipper's order consignment, retaining its character as interstate, it follows that there was no change in the character of the transaction in the further arrangement between the parties stipulating the method of payment of the price. The transaction from inception to the end was continuous and interstate in its character, for the contract now under consideration related to the method of the payment of the price, and did not constitute a new contract for the sale of the goods. The following authorities fully sustain the view that the whole transaction was interstate and that its legality was not affected by the fact that the vendor had not complied with the laws of this State" (Citing cases).

The facts in the other case relied upon by appellees, that of *L. D. Powell Co.* v. *Roundtree, supra,* were that a foreign corporation, which had not complied with the laws of this State authorizing it to do business in this State, had sold certain books to a resident of this State, title to the books being reserved in the seller until the purchase money was paid. Default was made in the payment of the purchase money, and a representative of the corporation came into the State and took possession of the books, and, after doing so, sold them to Roundtree, again reserving the title until the books were paid for. This second sale was made in this State, all the terms thereof being agreed to at the time and place of sale, and delivery was made in the State. This second purchaser defaulted in his payments, and the corporation brought suit in replevin to recover possession of the books. The defense was made that the second sale constituted doing business in this State, and that the action could not be maintained for that reason. In holding against that contention it was there said:

"The larger part of the books in the instant case were not sold on order to Judge Roundtree for future delivery, but were in the State when sold, and were immediately delivered to him. Appellee contends that the presence of the goods in the State at the time of the sale, and the immediate delivery thereof to the purchaser, made it an intrastate transaction. The case of *Hogan* v. *Intertype Corporation,* 136 Ark. 52, 206 S. W. 58, is cited in support of the contention. In the Hogan case the machinery had been shipped into the State to shipper's own order for the purpose of selling same to Hogan after demonstration, and was retained as the sole and independent property of the Intertype Corporation until after such demonstration and sale to him. In the instant case the books were not shipped into the State as the sole and independent property of the appellant for the purpose of selling them to appellee or any other person. On the contrary, they were shipped into the State by appellant to McNeill on an order for future delivery,

obtained by appellant's traveling agent. The McNeill contract clearly covered an interstate transaction. *Coblentz & Logsdon* v. *L. D. Powell Co.,* 148 Ark. 151, 229 S. W. 25. The recovery of the books under the McNeill contract amounted to a collection growing out of an inter state transaction. The collection was made in books instead of money, and we think the resale of them, in order to convert them into money, was a continuation of the interstate transaction. It was the only practical method by which a collection could be completed against one who had defaulted on an interstate contract. Other-wise it would have been necessary to incur the expense of shipping the books out of the State in order to convert them into money. The statutes of this State requiring for-eign corporations to comply with certain conditions before doing intrastate business were not intended to place such a burden upon the enforcement of good faith interstate transactions. We think the doctrine announced in the case of *Rose City Bottling Works* v. *Godchaux Sugars, Inc.,* 151 Ark. 269, 236 S. W. 825, is applicable and controlling in this case.''

So here, the preparation and delivery of the papers, as required in the letter from the company to the bank, pursuant to a previous agreement submitted to and accepted by the company at its office in Iowa, was a mere incident to the contract which involved an interstate transaction.

In the case of *Norfolk & Western Ry. Co.* v. *Sims,* 191 U. S. 441, 24 S. Ct. 151, 48 L. ed. 254, Mr. Justice Brown, speaking for the Supreme Court of the United States, said:

''A sale really consists of two separate and distinct elements: first, a contract of sale, which is completed when the offer is made and accepted; and, second, a delivery of the property, which may precede, be accom-panied by, or follow the payment of the price, as may have been agreed upon between the parties. The sub-stance of the sale is the agreement to sell and its accept-ance. That possession shall be retained until payment

of the price may or may not have been a part of the original bargain, but, in substance, it is a mere method of collection, and we have never understood that a license could be imposed upon this transaction, except in connection with the prior agreement to sell, although, in certain cases arising under the police power, it has been held that the sale is not complete until delivery, and sometimes not until payment."

This language was employed in a case which involved the validity of a statute of North Carolina, which required every manufacturer of sewing machines and every person engaged in the business of selling them to obtain a State license authorizing that action. The Supreme Court of North Carolina had held (*Sims* v. *Norfolk & Western Ry. Co.*, 130 N. C. 556, 41 S. E. 673), that, as the machine there in question had been shipped into that State c. o. d., to be delivered to the consignee upon the payment of the purchase price in that State, the sale was made in that State, for the reason that the title to the machine did not pass until the payment of the purchase price had been made to the delivering carrier as agent of the shipper. But, as appears from the above quotation, the Supreme Court of the United States, in reversing the decision of the Supreme Court of North Carolina, held that the contract of sale and shipment of the article sold pursuant to that contract from one State to another was an act of interstate commerce, regardless of the circumstances attending the delivery which occurred in that State.

We conclude therefore that the transaction here under review was an act of interstate commerce, and the judgment of the court below holding to the contrary will therefore be reversed, and the cause remanded.

HART, C. J., and HUMPHREYS and MEHAFFY, JJ., dissent.