**ROSE'S MOBILE HOMES, INC.,**
**Plaintiff,**

v.

**REX FINANCIAL CORPORATION and Rex-Noreco, Inc., Defendants,**

v.

**John P. and Dorothy L. ROSE,**
**Third-Party Defendants.**

**No. FS–74–61–C.**

United States District Court,
W. D. Arkansas,
Fort Smith Division.

Nov. 6, 1974.

Willard Crane Smith, Jr., Ft. Smith, Ark., for plaintiff.

J. H. Evans of Warner & Smith, Ft. Smith, Ark., for defendants.

## OPINION

JOHN E. MILLER, Senior District Judge.

The pleadings in this case are rather extensive but it is not necessary to set them out in extenso. A brief summary of the pleadings is sufficient to outline the issues in the case.

On May 17, 1974, plaintiff, Rose's Mobile Homes, Inc., filed its complaint against Rex Financial Corporation and Rex-Noreco, Inc., in which it alleged:

A. Plaintiff (Rose) is an Arkansas corporation with its principal place of business in Fort Smith, Arkansas.

B. Defendant Rex Financial Corporation (Rex) is a foreign corporation

with its principal place of business in Englewood Cliffs, New Jersey, doing business in Arkansas by virtue of lending money and engaging in other financial activities in the State. It is not authorized to do business in Arkansas.

C. On June 13, 1973, plaintiff and Rex entered into two written agreements in the State of Arkansas, copies of which were attached to the complaint as Exhibits A and B. Exhibit A is a floor plan security agreement and Exhibit B is a recourse agreement, both executed in the State of Arkansas.

D. Plaintiff executed promissory notes payable to the order of Rex for the financing of mobile home inventories and executed assignments of retail contracts to Rex, all of which occurred in the State of Arkansas.

E. Rex solicited loans, took orders, maintained accounts, delivered funds, and caused to be delivered merchandise and has done other acts with the plaintiff and others in Arkansas, which constituted doing business within the State.

The relief sought is a declaratory judgment that defendants are foreign corporations not qualified to do business in the State of Arkansas; that the transactions between the parties constituted doing business in the State of Arkansas by the defendants in violation of Ark.Stat.Ann., § 64–1201 et seq.; that all the notes, security agreements, and other instruments executed by plaintiff to defendants are void and unenforceable and plaintiff is entitled to a cancellation of all its obligations to the defendants under said instruments, and that plaintiff is entitled to the absolute title and ownership of all property involved free and clear of all liens and other rights claimed by defendants.

On June 13, 1974, the time for filing answer was extended to June 24 and on that date defendants filed their answer, together with counterclaim by Rex.

In the answer the defendants admit that plaintiff is an Arkansas corporation with its principal place of business in Fort Smith, Arkansas, and that defendants are foreign corporations not qualified to do business in Arkansas; that the floor plan, security agreement, and the recourse agreement between plaintiff and Rex were executed, but it is denied that the same were entered into or executed in the State of Arkansas. All other allegations of the complaint are denied.

As an affirmative defense, defendant Rex-Noreco, Inc., alleged that it has never entered into any agreements or had any contracts or dealings with the plaintiff.

In the counterclaim of Rex it is alleged that pursuant to the floor plan security agreement it has an inventory of seven mobile homes financed for plaintiff as evidenced by four combination demand promissory notes and security agreements. Attached to the counterclaim are copies of the notes and security agreements. Rex has demanded payment of the principal balance of $48,629.00, plus interest, but plaintiff has failed and refused to pay same, and Rex is therefore entitled to the possession of those seven units.

It is further alleged in the counterclaim that pursuant to the recourse agreement Rex purchased a number of retail contracts from plaintiff. The purchasers on 22 of these contracts are delinquent on their payments, and demand has been made that plaintiff repurchase same, but plaintiff has failed and refused to do so. The repurchase price due Rex is $164,691.47.

That Rex is entitled to a declaratory judgment that the recourse agreement is a valid and subsisting agreement, and that the plaintiff has a continuing duty to repurchase retail contracts from Rex under the terms and provisions of the agreement.

Rex also seeks a judgment of possession of the seven mobile home units, in each of which Rex has a security interest, and for judgment against plaintiff for $164,691.47, plus interest at ten percent per annum.

Rex filed an affidavit for immediate delivery of possession of the seven mobile homes on which it holds a security interest.

The defendants further asked that the complaint of plaintiff be dismissed, for their costs and all proper relief.

In its answer to the counterclaim of Rex, the plaintiff denied that Rex is entitled to any of the relief sought under the allegations of plaintiff's complaint that Rex is doing business in the State without having qualified to do so.

On June 25, 1974, Rex filed a third-party complaint against John P. Rose and Dorothy L. Rose, in which it was alleged that they had executed and delivered to Rex a guaranty agreement wherein they guaranteed payment and performance of all obligations of the plaintiff, Rose's Mobile Homes, Inc. A copy of that agreement was attached as an exhibit. The relief sought by Rex against the third-party defendants is for joint and several judgment against them for $164,691.47.

In due time the third-party defendants filed their answer to the third-party complaint, in which they alleged that the third-party complaint failed to state a claim against them and that the third-party plaintiff was barred from any recovery because it is a foreign corporation not qualified to do business in the State, but has actually been doing business therein. Also, the third-party defendants filed a counterclaim against both defendants in which they alleged that the defendants had ruined their reputation and had undertaken to prohibit them from engaging in any business activity, and that they had been damaged in the sum of $180,000.00 because the conduct of the two defendants was wilful and wanton.

On August 6, 1974, Rex filed an amendment to its original counterclaim and an amendment to its complaint against the third-party defendants reviewing and extending its claim for interest.

Other miscellaneous pleadings were filed and orders entered thereon, such as petition for temporary restraining order and petition for preliminary injunction against plaintiffs and third-party defendants. The pleadings resulted in the court entering various orders on July 26, 1974, directing the plaintiff to deliver possession to Rex of the five mobile homes then in its possession, along with five other mobile homes which had been repossessed by plaintiff and on which Rex was the holder of the contracts of sale by assignment from plaintiffs. The order further provided that Rex should have authority to sell those ten homes under the provisions of the uniform Commercial Code of Arkansas, Ark. Stat.Ann., § 85–9–501 et seq., (1961 Repl.).

The case was tried to the court without a jury on August 22, 1974, upon the ore tenus testimony of six witnesses introduced by plaintiff together with plaintiff's 20 exhibits. The defendants introduced the ore tenus testimony of three witnesses, including the President and Vice President and an accountant, together with 39 exhibits which included the deposition of Mr. and Mrs. Rose.

Thorough and extensive briefs were filed by the parties, in which the various contentions of the parties were argued.

On its original brief the plaintiff stated:

"The issues involved in this case are:

"1.  Is Rex a foreign corporation not qualified to do business in the State of Arkansas?

"2.  Are Rex Financial Corporation and/or Rex-Noreco, Inc. doing business in the State of Arkansas?

"3.  Are the contracts in question Arkansas contracts or interstate contracts?

"4.  Are the 'assignments' to Rex Financial Corporation done in such a way that the assignments and liens created thereby are void thereby removing the hypotheca-

tion to Rex and allowing direct payment to Plaintiff."

On brief of Rex it contends that it is entitled to all of the following relief:

"1. Final judgment for possession of the ten mobile home units to which an Order of Delivery was granted on July 26, 1974.

"2. Judgment against the Plaintiff and Third Party Defendants for $52,216.58, being the principal and interest owing on the four promissory notes covering the floor planned units to date of trial, plus interest thereon at the rate of 10% per annum from date of trial.

"3. Judgment against the Plaintiff and Third-Party Defendants for $89,407.45 for the amount owing on delinquent retail installment sales contracts as of the date of trial, plus interest thereon at the rate of 10% per annum from date of trial.

"4. A Declaratory Judgment that the Recourse Agreement between the parties is a valid and subsisting agreement and that Plaintiff has a continuing duty to repurchase retail contracts from Rex under the provisions thereof.

"5. A Declaratory Judgment that the Guaranty Agreement of the Third Party Defendants is a valid and subsisting agreement and that the Third Party Defendants should remain bound to Rex in the future under its terms and conditions.

"6. Judgment against the Third Party Defendants in the amount of any monetary loss or damages Rex may sustain based upon the Plaintiff's claim."

On its reply brief plaintiff states that it and the third-party defendants are entitled to the following relief:

"(a) An avoidance and vacation of the original contracts entered into by and between the Plaintiffs and the Defendants.

"(b) An avoidance and vacation of the third party guarantee entered into by and between the third party Defendants and the Defendants.

"(c) A release of all liens and encumbrances upon the contracts subsequently assigned to the Defendants.

"(d) Its reasonable costs and attorney's fees.

"(e) All other relief to which the Plaintiff or the third party Defendants are entitled."

### Findings of Fact

There is little, if any, dispute concerning the material facts. The court has reviewed all of the evidence and has carefully considered the record as a whole, and the court finds and summarizes the decisive and material facts as follows.

The plaintiff is an Arkansas corporation organized and existing under the laws of Arkansas with its principal business in Fort Smith, Arkansas. The third-party defendants are citizens and residents of Arkansas.

Both defendants are corporations organized under the laws of the State of New Jersey with their principal place of business at Englewood Cliffs, New Jersey. Neither corporation has ever been qualified to do business in the State of Arkansas. Rex is a wholly owned subsidiary of Rex-Noreco, Inc. All transactions involved in this litigation were between the plaintiff and third-party defendants with Rex.

In 1972 the plaintiff was seeking financing for an inventory and an outlet for the sale of retail installment sales contracts. He had contacted some three or four financial institutions engaged in that type of financing. He heard of the operations of Rex and called Rex's office in Englewood Cliffs, N. J., where he talked to a Mr. Dave Wehr. On September 20, 1972, he wrote Mr. Salitan, President of Rex, concerning his need for fi-

nancing. The first paragraph of his letter is as follows:

"This letter is in reference to a phone conversation of September 20 with Mr. Dave Wehr, the context of which was an application to be furnished by me for the availability of establishing a line of credit for floor planning and contracts for a mobile homes sales lot in Fort Smith, Arkansas."

Mr. Rose then set forth his experience in the sale of mobile homes and gave personal character references.

As a result of the letter Rex began purchasing retail contracts from Rose in October of 1972, but Mr. Rose's inventory was being financed by another financial institution. At that time no written agreement had been entered into between Rose and Rex. On February 1, 1973, Mr. Rose incorporated his business under the laws of the State of Arkansas under the name of Rose's Mobile Homes, Inc. The sole stockholders were Mr. Rose, his wife and daughter, but neither of the latter had anything to do with the operation of the business and knew anything about it. Prior to the incorporation, no employee or representative of Rex had personally met Mr. Rose for any purpose. In February 1973, Mr. Irv Mersky, an employee of Rex, came to Fort Smith with the proposed floor plan security agreement (Def.Ex. 2), recourse agreement (Def.Ex. 1), guaranty agreement (Def.Ex. 3), and a financing statement (Def.Ex. 8, 9), for execution. None of the instruments had been executed by Rex. The recourse agreement and the floor plan security agreement were executed in Fort Smith, Ark., on behalf of plaintiff by Mr. Rose as President and his wife as Secretary. The financing statement was executed by Mr. Rose in Forth Smith as President of Rose's Mobile Homes, Inc. The guaranty agreement was executed by Mr. Rose and wife in their individual capacities. These instruments were then returned to New Jersey by Mr. Mersky where they were accepted by Rex and the guaranty agreement was executed by the proper officials of Rex. A copy of the financing statement was mailed by the President of Rex to the Circuit Clerk of Sebastian County, Ark., where it was filed February 26, 1973, and also a copy was mailed to the Secretary of State where it was filed February 27, 1973. At the time of the execution by Rex's officials in New Jersey the dates were not filled in, and later Mr. Rose requested copies of these instruments, and by letter dated June 13, 1973, copies were mailed to Mr. Rose and the date of June 13, 1973, was erroneously inserted at that time. The purpose of the execution and filing of the financial statement was to allow Rex to perfect its security interest in inventory to be financed for plaintiff, and since Mr. Rose had just incorporated his business, the guaranty agreement was to personally bind Mr. and Mrs. Rose for all obligations of their corporation.

All dealings between Mr. Rose and Rex during the time Rose operated his business under the individual ownership was by telephone or mail between Arkansas and New Jersey. After the incorporation by Rose in February 1973, all dealings continued to be by telephone and mail.

Aside from the time when Mr. Mersky was in Fort Smith in February 1973 with the various instruments above listed, the only other contact between Rose and employees or representatives of Rex was a periodic check, usually about once a month of the floor plan inventory to make sure that Rose had the required number of mobile homes on hand.

A reference to the floor plan security agreement discloses that Rex was only obligated to finance such inventories for Rose as might be acceptable to Rex. Under the plan, when Rose desired to place additional units on his lot, he would contact the manufacturer and obtain the names, serial numbers and purchase prices of the units in which he was interested. He would then telephone this information to Rex, and if Rex was agreeable to financing the units, the manufacturer would be so advised, and would then deliver the mobile

homes to Rose and send the invoices and certificates of origin to Rex. Upon delivery Rose would fill out and execute a promissory note and security agreement in the correct amount and mail it to Rex. Rex would then mail the manufacturer a check for the correct amount.

Under the terms of the recourse agreement Rex was only obligated to purchase such retail contracts from Rose as Rex, in its discretion, might elect to acquire. The credit status of the prospective purchaser was important to Rex in determining whether it wished to purchase the contract from Rose. In order to expedite the business and save Rose the risk of entering into a contract of sale which Rex would refuse to buy, Rose would not enter into any contract of sale until Rex had verbally agreed by telephone to buy the contract. They would enter into a tentative agreement on the terms of the sale. Rose would obtain certain credit information from the prospective purchaser and telephone that information to Rex. Rex would also obtain certain credit information from the prospective purchaser and would then telephone Rose and let him know whether it was willing to purchase the proposed contract. If so, Rose would fill out an installment sales contract detailing the terms of the purchase, which contract would be executed by the purchaser, and then executed by Rose or one of his employees on behalf of the plaintiff as seller. Rose would then execute on behalf of his corporation the recourse assignment to Rex on the back of the contract and mail it to Rex. Upon receipt, Rex would deduct from the purchase price the amount owing under the floor planning of the unit and remit the balance to Rose by check through the mail. When this was done, Rex would send a copy of the contract and certificate of origin to the Arkansas State Revenue Department, and title to the mobile home would be issued by the State of Arkansas in the name of the purchaser showing a lien in favor of Rex. The title was then mailed to Rex

and held by it until the purchase price had been paid in full.

When Rose made a cash sale, he would not contact Rex prior thereto since there would be no contract with the purchaser to sell to Rex. From the sale price Rose would mail a check to Rex for the amount owing on the floor planning of the unit, and Rex would mail a certificate of origin to Rose who would then deliver it to the purchaser.

At the time this action was commenced Rose had seven mobile homes financed by Rex in the principal sum of $48,629.00 as evidenced by promissory notes of defendants, Ex. 4, 5, 6 & 7. Rose sold two of the units, and failed to remit to Rex the amount owing thereunder. At the date of the trial interest on the floor planning had accumulated, making a total owing on the floor planning of $52,216.58. Under the terms of the recourse agreement and the recourse assignment on the back of each contract, Rose was required upon demand by Rex to repurchase the contracts on which the payments were delinquent for the outstanding principal balance owing on each contract.

On May 23, 1947, (Def.Ex. 10) Rex demanded payment in full forthwith of the entire floor plan balance. On June 4, 1974, Rex, through its president, wrote Mr. Rose about the past-due accounts in the sum of $164,691.47, in addition to the floor plan balances about which he had written Mr. Rose on May 23, 1974. Also, Rex, under the terms of the recourse agreement and the recourse assignments demanded that the plaintiff repurchase contracts on which the payments were delinquent for outstanding principal balance owing in the contract. There were 21 such contracts totaling $89,407.45.

### The Applicable Law

Jurisdiction is granted by 28 U.S.C.A. § 1332, since the parties are citizens of different states and the matter in controversy exceeds the sum or value of $10,000.00, exclusive of interest and

costs. The substantive law of Arkansas applies.

The plaintiff in its original complaint alleged that the defendants, although not qualified to do business in Arkansas as corporations, have done business, and therefore the contracts and documents involved herein are null and void, and that the notes, security interests, financing statements, and other items relating thereto are unenforceable and are void ab initio because of defendants' failure to file the articles of incorporation or certificates as provided by the laws of the State of Arkansas.

The defendant Rex admits that it did not qualify under the statutes of Arkansas to do business in Arkansas, and denies that the contracts and other documents involved herein were executed or entered into in the State of Arkansas.

The defendant Rex-Noreco, Inc., denies that it entered into any agreements with plaintiff or that it has ever had any contracts or dealing with the plaintiff in any shape, form or fashion, and has no liability whatsoever to plaintiff.

On its brief plaintiff cited several cases in support of its contention that Rex was doing business in Arkansas and that, under the terms of the statutes hereinafter referred to, it cannot maintain an action on the contracts. It is not necessary to set forth all of the cases so cited by plaintiff. Suffice it to say that the court has examined each of the cases, as well as the Law Review articles referred to in the brief, and they are all concerned solely with the question of whether the contacts of an unqualified foreign corporation with a particular state were of such nature as to give the courts of that state valid personal jurisdiction over foreign corporations. "Doing business" for personal jurisdiction is completely different from "doing business" under the so-called Wingo Act (Ark.Stat.Ann., § 64–1202).

The term "doing business" for jurisdictional purposes is sometimes loosely used in the decisions. A more accurate description would be that the unquali-fied foreign corporation had "sufficient contacts with a state in order to give the courts of that state valid personal jurisdiction." Under the Uniform Interstate and International Procedure Act, Ark. Stat.Ann., § 27–2502 to 27–2507, (1962 Repl.), commonly called the "long-arm" statute enacted by many states including Arkansas, the contacts need be only minimal in order to confer personal jurisdiction. There are several reasons that under the facts in the instant case and the applicable law this contention of the plaintiff is without merit.

The statutes relied upon by plaintiff are as follows:

Ark.Stat.Ann., § 64–1201 (1966 Repl.), provides that every company or corporation incorporated under the laws of any other state, territory, or country "doing business in this State, shall file in the office of the Secretary of State of this State a copy of its charter or articles of incorporation or association, or a copy of its certificate of incorporation, duly authenticated and certified by the proper authority, together with a statement of its assets and liabilities and the amount of its capital employed in this State, and shall also designate its general office or place of business in this State, and shall name an agent upon whom process may be served."

Section 64–1202 provides:

"Any foreign corporation which shall fail to comply with the provisions of this act [§§ 64–1201, 64–1202], and shall do any business in this State, shall be subject to a fine of not less than $1,000, * * *, and as an additional penalty, *any foreign corporation which shall fail or refuse to file its articles of incorporation or certificate as aforesaid, cannot make any contract in the State which can be enforced by it either in law or in equity, * * *.*" (Emphasis added.)

The contract was not made in Arkansas. It is not disputed that the last act necessary for completion of the contract was performed in New Jersey when the President of Rex signed the

various documents. Thus, the contract became a New Jersey contract and may be enforced in Arkansas despite the status of Rex as an unqualifying corporation.

In Goode v. Universal Plastics, (1969) 247 Ark. 442, beginning at page 444, 445 S.W.2d 893, beginning at page 895, the court said:

> "The trial court was correct in its finding that the contract was made in Tennessee. The rule is stated in Leflar's American Conflicts Law (1969), § 144 at page 353:
>
>> " 'The authorities are reasonably clear that, in this event, the contract is made at the time and place "where the last act necessary to the completion of the contract was done —that is, where the contract first creates a legal obligation." '
>
> "The solicitor of a contract may by its terms dictate the mode of acceptance by which legal obligations will arise thereunder. Mechanics' Lumber Co. v. Yates American Machine Co., 181 Ark. 415, 26 S.W.2d 80 (1930). The terms of the instrument before us make it clear that no contract came into being until acceptance by appellee at its home office in Tennessee. Upon approval in Tennessee 'the last act necessary to completion of the contract was done.' The contract was therefore a Tennessee contract and appellee may enforce it in the Arkansas courts despite its status as a non-qualifying corporation. Brown Broadcast, Inc. v. Pepper Sound Studio, Inc., supra [242 Ark. 701, 416 S. W.2d 284]."

In UPI v. Hernreich, d/b/a Station KZNG, (1969) 241 Ark. 36, beginning at page 41, 406 S.W.2d 317, beginning at page 320, the court said:

> "The statute (§ 64–1202) has two distinct penalty provisions. The first provision is a fine to be collected against any non-domesticated foreign corporation that does business in this State. This fine provision applies regardless of where any contract may have been made, but the statute does not state that the assessment of the fine also makes the contract void. The second penalty provision in the statute is the one here in issue, and is contained in this statutory language: ' * * * and as an additional penalty, any foreign corporation which shall fail or refuse to file its articles of incorporation or certificate as aforesaid, *cannot make any contract in the State which can be enforced by it either in law or equity * * *.*' (Italics our own.) It will be observed that by the quoted language the courts of this State are closed to any non-domesticated foreign corporation only when seeking to enforce any contract *made in this State.* So the place of the making of the contract becomes most material in the case at bar, assuming any intrastate commerce is involved and that any such would taint the entire transaction."

In Brown Broadcasting, Inc., v. Pepper Sound Studio, (1967) 242 Ark. 701, at page 703, 416 S.W.2d 284, at page 286 the court said:

> "If the contract here sued on was made in Tennessee it was not necessary for Pepper to comply with the section first mentioned. It was so held and fully explained in UPI v. Hernreich, d/b/a Station KZNG, 241 Ark. 36, 406 S.W.2d 317. In Pepper's complaint it is alleged that this contract was 'accepted by plaintiff at his home in Memphis, Tennessee'. Appellant, in its answer, admitted the above allegation was true. The notes, themselves, show they were executed in Memphis. We find no evidence in the record to show the contract was executed in Arkansas. In UPI, supra, we approved this statement:
>
>> " ' "It has been said that the Arkansas Statute cannot apply to prevent actions on contracts not made in Arkansas, even though interstate commerce be not involved." ' "

Also, see the Equitable Credit Co. v. Rogers, (1927) 175 Ark. 205, 299 S.W. 747, and Davis & Worrell v. General Mo-

tors Acc. Corp., (1922) 153 Ark. 626, 241 S.W. 44.

█ The statute relied upon by the plaintiff to nullify its undisputed obligations does not prevent action on contracts relating to transactions in interstate commerce. In Pratt Laboratories v. Teague (W.D.Ark.1958) 160 F.Supp. 176, the court at page 180 quoted from W. T. Rawleigh Medical Co. v. Rose, 133 Ark. 505, 513, 202 S.W. 849, 851, as follows:

" 'We do not understand that the act in question applies to foreign corporations engaged in interstate commerce. It is not within the police power of the state to place burdens upon individuals or corporations engaged in interstate commerce unless the burden is sanctioned by Congress. Crenshaw v. State of Arkansas, 227 U.S. 389, 33 S.Ct. 294, 57 L.Ed. 565.' "

In Sillin v. Hessig-Ellis Drug Co., (1930) 181 Ark. 386 at page 389, 26 S. W.2d 122, at page 123 the court said:

"We are of the opinion that all of the transactions between the parties were interstate and that their legality as objects of interstate commerce was not affected by the fact that appellee has not complied with the laws of this State. Rose City Bottling Works v. Godchaux Sugars, 151 Ark. 269, 236 S.W. 825; L. D. Powell Co. v. Rountree, 157 Ark. 121, 247 S.W. 389; 30 A.L.R. 414; Linograph Co. v. Logan, 175 Ark. 194, 299 S.W. 609; and People's Tobacco Co. v. American Tobacco Co., 246 U.S. 79, 38 S.Ct. 233, 62 L. Ed. 587."

In Republic Power & Service Co. v. Gus Blass Co., (1924) 165 Ark. 163, at page 167, 263 S.W. 785, at page 786 the court said:

"It is well settled that the only limitation upon the power of the state to exact conditions upon which foreign corporations may transact business within its borders is where such corporations are engaged in interstate commerce, and that this limitation arises only because the federal Consti-tution has committed to Congress the power to regulate commerce between the states. Kansas City Structural Steel Co. v. State, 161 Ark. 483, 256 S.W. 845; Browning v. Waycross, 233 U.S. 16, 34 S.Ct. 578, 58 L.Ed. 828; and Mitchell Furniture Co. v. Selden Brack Construction Co., 257 U.S. 213, 42 S.Ct. 84, 66 L.Ed. 201."

In Moran v. Union Savings Bank & Trust Co., (1936) 193 Ark. 16, at page 19, 97 S.W.2d 638, at page 640 the court said:

"It is next contended that appellee cannot maintain this action because it is a foreign corporation not authorized to do business in this state. It does not appear from this record that appellee is doing business in this state. The fact that it bought a note and mortgage from the American Investment Company of Oklahoma, which mortgage covers property in Arkansas, is not sufficient to show that it is doing business in this state. Nor is the fact that it comes into the state to collect its debt sufficient to constitute the doing of business in this state. Linton v. Erie-Ozark Mining Company, 147 Ark. 331, 227 S.W. 411; L. D. Powell Company v. Rountree, 157 Ark. 121, 247 S.W. 389, 30 A.L.R. 414; Sturdivant v. Ka-Dene Medicine Company, 169 Ark. 535, 275 S.W. 921. The transaction between the American Investment Company and appellee, whereby the note and mortgage were assigned to the latter, was an interstate transaction and as the Supreme Court of the United States said in the case of Furst v. Brewster, 282 U.S. 493, 51 S.Ct. 295, 296, 75 L.Ed. 478: 'Accordingly, when a corporation goes into a state other than that of its origin to collect, according to the usual or prevailing methods, the amount which has become due in transactions in interstate commerce, the state cannot, consistently with the limitation arising from the commerce clause, [Const. U.S., art. 1, § 8, cl. 3], obstruct the attainment of that purpose.' "

In Goode v. Universal Plastics, supra, the court at page 445 of 247 Ark., page 895 of 445 S.W.2d said:

"The evidence also supports the trial court's determination that the performance of the contract involved an interstate transaction. The terms of the contract clearly indicated that appellee was to mail the book covers from its plant in Cookeville, Tennessee, to telephone subscribers in the Conway area. The 5000 covers were so distributed. Thus appellee, a consignor outside the State, shipped goods directly to consignees within Arkansas. This action places the transaction between appellant and appellee wholly in interstate commerce. Hogan v. Intertype Corp., 136 Ark. 52, 206 S.W. 58 (1918); McLeod v. J. E. Dilworth Co., 205 Ark. 780, 171 S.W.2d 62, 322 U.S. 327, 64 S.Ct. 1023, 1030, 88 L.Ed. 1304 (1943). A contract calling for a transaction wholly in interstate commerce is enforceable in Arkansas courts by a corporation not qualified under § 64–1202 to do business in Arkansas. W. T. Rawleigh Medical Co. v. Rose, supra."

In 15 Am.Jur.2d, Commerce, § 3, the authors at page 633 said:

"Generally, it has been said that the distinguishing feature and indispensable element of interstate commerce is importation into one state from another. But while transportation alone across state lines is commerce subject to the regulatory power of Congress, regardless of whether title to the merchandise passes before or after such transportation, such commerce is not confined to transportation among the states, but comprehends all commercial intercourse between different states and all the component parts of that intercourse."

In Footnote 15 on page 633, many cases are cited supporting the proposition that interstate commerce comprehends all commercial intercourse between different states and all the component parts of that intercourse, and quotes from Union Interchange, Inc. v. Parker, 138 Mont. 348, 357 P.2d 339, as follows:

"For an activity to be classified as interstate commerce, it is not necessary that such activity encompass the transfer of goods or persons across state lines; mere correspondence resulting in contractual obligations between citizens of different states is sufficient to constitute interstate commerce."

In an annotation in 7 A.L.R.2d, § 3, the annotator at page 258 said:

"Except under constitutional or statutory provisions expressly providing otherwise, the rule is quite general that while a contract entered into by a foreign corporation which has not complied with the conditions of doing business in the state would be void or voidable while still executory, and so not enforceable by the corporation, the contract, after it has been fully executed, is to be treated as a valid contract, and the corporation may maintain or defend its rights arising under the contract."

All the acts required to be performed by Rex under the contract have been performed in New Jersey. There is nothing for Rex to do that it hasn't already performed prior to the breach of the contract by plaintiff, and it is merely trying to collect what is has earned by its performance. Clearly, the contract insofar as Rex is concerned has been executed.

In Republic Power & Service Co. v. Gus Blass Co., supra, the court at page 169 of 165 Ark., page 787 of 263 S.W.2d said: "An 'executed contract is one where whatever is contracted to be done on either hand has been done."

The court further said at page 169, 263 S.W.2d at page 787:

"It is insisted that, although the contract may be an intrastate one and void under the statute and not enforceable under it, a different rule prevails where the contract is fully executed.

948

"It is pointed out that the former decisions of this court are in line with this doctrine, and fully recognize the distinction between executory and executed void contracts, to the effect that, while suits to enforce the former may always be defended on the ground of their invalidity, no relief prayed on such ground can be granted with respect to the latter."

In 36 Am.Jur.2d, Foreign Corporations, § 306, beginning on page 305 the authors state:

"The fact that a foreign corporation entering into a contract had not complied with the conditions of doing business in the state has been recognized as not precluding its assertion of the contract as a defense in an action against it, where the contract had been fully executed."

Rex has fully complied with the contract and plaintiff and third-party defendants have received the benefit of such compliance. No doubt, the plaintiff and the third-party defendants, who had prospered after they obtained financing from Rex, would have continued to prosper and comply with their part of the contract by meeting their obligations except for the change in economic conditions which, in the opinion of the court, caused Mr. Rose to default in payment for the benefits received by plaintiff from the full compliance by Rex, and it is entitled to recover the sums claimed by it.

■ The plaintiff and third-party defendants make a contention based on the principle of election of remedies as set forth by this court in the case of Pellerin Laundry Machinery Sales Co. v. Hogue, (W.D.Ark.1963) 219 F.Supp. 629. Rose argues that since Pellerin was decided after the Uniform Commercial Code was enacted in Arkansas, that its holding is therefore based upon the provisions of UCC. As a matter of fact, the UCC, Act No. 185 of 1961, became effective at midnight on December 31 of that year. The Pellerin case was decided in 1963 which was after the effective date of the Act, but the obligations involved in the Pellerin case accrued in 1958, prior to the effective date of the UCC. In deciding the Pellerin case, the court was bound by the law as it existed in 1958 when election of remedies was in existence in Arkansas in such cases. Under § 85–9–501(1) of UCC, the remedies of the secured party were cumulative and he can have both possession and judgment. Williams v. Westinghouse Credit Corp., (1971) 250 Ark. 1065, 468 S.W.2d 761, and the contention of plaintiff and third-party defendants is without merit.

■ Another contention made by plaintiff and third-party defendants is that their business reputation has been ruined by Rex and that Rex had effectively put them out of business. No evidence even tends to establish such contention and, as above stated, it appears to the court that Rex is in nowise responsible for the default of said parties. After a full consideration of the contentions of all the parties and the evidence before the court, the court is of the opinion that Rose's Mobile Homes, Inc., and John P. and Dorothy L. Rose are not entitled to any of the relief sought by them, and therefore their claims should be dismissed.

Under the facts and the applicable law, Rex is entitled to the following:

1. Judgment for possession of the ten mobile home units covered by the order of delivery granted by this court on July 26, 1974.

2. Judgment against plaintiff and third-party defendants for $52,216.58, principal, and interest owing on the four promissory notes covering the floor plan units on the date of the trial, August 22, 1974, together with interest on said amount until paid at the rate of ten percent per annum from said date, August 22, 1974.

3. Judgment against plaintiff and third-party defendants for $89,407.45, the amount due on August 22, 1974, on the delinquent retail installment sales contracts, plus interest thereon at the rate of ten percent per annum until paid.

4. Judgment holding that the recourse agreement between the parties is a valid agreement and the plaintiff, Rose's Mobile Homes, Inc., has a continuing duty to repurchase retail contracts from Rex under the provisions of said agreement.

5. Judgment that the guaranty agreement of the third-party defendants is valid and that the third-party defendants, John P. Rose and Dorothy Rose, should remain bound to Rex in the future under its terms and conditions until the indebtedness hereinbefore adjudged is paid.

6. Judgment that the costs accruing in this court in this action should be taxed against the plaintiff and third-party defendants.

Judgment in accordance with the above is being entered today.