In re BRAGG'S ELECTRIC CONSTRUC-
TION CO., Debtor.

BRAGG'S ELECTRIC CONSTRUCTION
CO., Plaintiff,

v.

REBSAMEN COMPANIES et
al., Defendants.

In re Don JAMES and Betty James
d/b/a James Oil Company & Ginners
Mill Property, Debtor.

In re COX COTTON COMPANY d/b/a
James Grain & Cotton
Company, Debtor.

In re Don JAMES, Robert James and G. E.
James, A General Partnership d/b/a
Frisbee Cotton Company and James
Grain & Elevator, Debtor.

Robert P. LINDSEY, Trustee, Plaintiff,

v.

WILLIAM G. PHILLIPS & CO., Premium
Financing Specialists et al.,
Defendants.

Bankruptcy Nos. LR 80–382, AP 80–175, LR JO 80–153–JO 80–155 and AP 80–373.

United States Bankruptcy Court, E. D. Arkansas, Jonesboro Division.
United States Bankruptcy Court, E. D. Arkansas, W. D.

Oct. 17, 1980.

Ben F. Arnold, Little Rock, Ark., Warren Dupwe, Jonesboro, Ark., A. Jan Thomas, Jr., West Memphis, Ark., for plaintiffs.

W. P. Hamilton and William L. Owen, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

CHARLES W. BAKER, Bankruptcy Judge.

Because of the common question of law involved, the two above–captioned adversary proceedings have been combined in this Memorandum Opinion.

In Adversary Proceeding No. 80–175, the plaintiff (Bragg's Electric Construction Co.) is the debtor–in–possession in a Chapter 11 proceeding. In the normal course of its electrical contracting business it acquired casualty insurance with the United States Fidelity & Guaranty Company (U.S.F.& G.). The defendants are the insurance agent (Rebsamen) and its wholly owned subsidiary, Manhattan Credit Corporation. Rebsamen (the agent) entered into a so–called "premium financing agreement" whereby Bragg signed a promissory note (in favor of Manhattan, the subsidiary) providing for the payment of eight installments of $2,254.41 each representing the $21,723.00 yearly premium of the aforesaid policies less a down payment of $4,344.00 and a finance charge of $656.90 on the $17,378.60 which Rebsamen paid to U.S.F.& G.

To secure the note Bragg assigned to Rebsamen (Manhattan) its right to any unearned premium due upon cancellation of the policies as well as the power to cancel the policies (and thus invoke the right to the premiums) in the event of Bragg's default in payment of the note. No other security was advanced. Rebsamen resists the debtor's demand for an order restraining cancellation of the policies and asserts that it is entitled to payment of the note installments as a secured creditor or as an

administrative expense, or in the alternative that it is entitled to proceed with cancellation and collection of the remaining premiums. U.S.F.& G. is, largely, a disinterested party in these proceedings.

The facts in Adversary Proceeding No. 80–373 are essentially the same. Premium Financing Specialists seeks to have the automatic stay provision of 11 U.S.C. § 362 lifted so that it may exercise its alleged right to cancel three policies of insurance and have the unearned premiums under those policies paid to it. The debtor purchased policies of insurance for casualty coverage, automobile coverage, and workmen's compensation coverage with U.S. Fire, Hartford Insurance Co., and Traveler's Insurance Company respectively through an independent insurance agent, Phillips, for a total premium of $37,573.00. The insurance agent has PFS forms which were eventually filled out; thereafter, PFS sent to the insurance agent, Phillips, the sum of $23,306.00 which was the remaining amount of money due for the premiums on the aforesaid policies for one year's coverage after giving effect to the debtor's down payment in the sum of $14,267.00. The insurance agent sent the application for premium financing (Exhibit 2) to PFS and after acceptance by PFS in their Overland Park, Kansas office PFS sent to the debtor and the insurance agent its notice of acceptance (Exhibit 3) and a coupon book which provided for nine monthly payments of $3,515.00 each beginning on May 1, 1980. The debtor made the payments for May, June, and July and filed its proceeding under Chapter 7 of the Bankruptcy Code on August 12, 1980. PFS had not advised the insurance company prior to the date of filing that PFS was exercising any rights that it might have to cancel the policies. PFS did sent to the insurance companies notice that they had an assignment of the unearned premiums (Court's Exhibits 1, 2, and 3). No notice of an interest in the unearned premiums has been filed of record with any governmental agency. The debtor's case was changed from a Chapter 7 proceeding to a Chapter 11 proceeding on September 26, 1980.

PFS does not have any soliciting agents in the State of Arkansas. It does not have any representatives in the State of Arkansas who collect payments from insureds who finance their premiums with it. PFS does not pay any commissions to any of the agents who write the insurance for the various insurance companies. It appears that the debtor never actually signed the written agreement which forms the basis for its contract with PFS. An earlier form was signed, but revision was necessary because of clerical errors thereon. The absence of a signature, however, is not germane as the Court finds as a matter of fact that a verbal agreement incorporating the terms of the printed form was entered into between the debtor and PFS.

Because PFS is admittedly not qualified to do business in the State of Arkansas, the trustee argues that the contract is unenforceable in light of the Arkansas "WINGO" Act, Ark.Stat.Ann. § 64–1201 *et seq., see Union Planter Bank v. Moore,* 250 Ark. 272, 464 S.W.2d 786 (1971). However, it is well settled that because of the harshness of the doctrine, its provisions are to be narrowly construed, *Widmer v. J.I. Case Credit,* 243 Ark. 149, 419 S.W.2d 617 (1967), and moreover, even assuming (which the Court does not find) that this is an "Arkansas" contract, it is clear that the act is inapplicable to transactions of this nature, *Rose's Mobile Home v. Rex Financial Corp.,* 383 F.Supp. 937 (E.D.Ark.1974).

Nor is there substance to the defense raised in both adversary proceedings that the insurance contracts in question contain "non–assignability" clauses, as the debtors do not have standing to raise this issue, and even if they did, are estopped by their behavior from relying on these provisions.

■ The defendants, Rebsamen and PFS, in essence offer two alternative theories to buttress their opposition to the relief request by their respective debtor. First, they allege the existence of an *executory contract,* and maintain that if the debtors wish to assume the contracts, they must accord the protection afforded by

§ 365(b)(1) of the Code. Clearly there is no merit to this argument. The relationship between the debtors and the insurance carriers is not at issue herein. The issue is between the debtors and the premium financier and as between them there can be no executory contract because there is no performance due the debtor, and none due by the debtor other than the payment of the monies owed under the terms of the promissory notes. Where nothing is due other than the payment of money by one party, an executory contract cannot be found to exist, *see Collier's* 15th Ed. § 15.60 (1979). To hold otherwise would be tantamount to transforming all creditors of a debtor into executory contractees.

Alternatively, Rebsamen and PFS assert that they are a secured creditor, and point out that under § 9–104 of the Uniform Commercial Code as adopted in Arkansas—Ark.Stat.Ann. § 85–9–104—interests in insurance contracts are exempted from the ambit of the UCC, and thus from the requirement of filing for perfection. The section reads in applicable part:

> This article does not apply . . . (g) to a transfer of an interest in or claim in or under policy of insurance, except as provided with respect to proceeds and priorities in proceeds . . .

The debtors in both adversary proceedings reject the creditors' reading of this section, and assert that any lien which Rebsamen and PFS may enjoy is unperfected and thus defeated by virtue of the bankruptcy filing.

■ Although the question is interesting, and one not free from doubt, it will not be addressed as it is the Court's conclusion that a lien is impossible in these instances because there is no *property* to which a lien can attach.

■ Section 101(28) of the Bankruptcy Code—11 U.S.C. § 101(28)—defines a lien as follows:

> "lien" means charge against or interest in property to secure payment of a debt or performance of an obligation . . .

"Property" is not defined by the UCC. In general such matters are questions of state law.

Whether or not certain types of agreements such as consignments or leases create liens and thus fall within the scope of the bankruptcy definition (of a security interest) is a matter left to decision under state law. *Collier's* 15th Ed., § 101.37 (1979).

Clearly, under the UCC, "property" of some form must exist to create a "lien," which of course is a *sine qua non* of being a secured creditor.

Although there is not a great deal of authority on this subject, the Court feels itself bound by *Sweeney v. Sweeney*, Ark., 593 S.W.2d 21 (1980) in which the Arkansas Supreme Court held the earned and vested, but not yet operable, right to payment under a retirement plan to not be property for purposes of a divorce settlement. The Court reasoned this interest to be insufficiently tangible to be cognizable in the distribution of marital assets. The decision, moreover, is in accord with a previous judgment on a similar issue:

> We do not consider the right to receive retirement pay from the armed forces to be personal property within the meaning of Ark.Stat.Ann. § 34–1214, *supra*. The right to a pension and retirement pay, not yet due and payable, cannot be assigned, sold, transferred, conveyed, or pledged. *Fenney v. Fenney*, 259 Ark. 858, 537 S.W.2d 367 (1976).

The position of Rebsamen and PFS in the instant case is, if anything, more tenuous than that of the disappointed spouse in *Sweeney, supra*. Therein the husband was admittedly entitled to future retirement payments. No absolute right of such a kind did—or could—exist herein. The enjoyment of the unearned premium was entirely dependent upon the possibility of an action by the debtor (a failure to pay the note) and thereafter an exercise of the financier's right to cancel the insurance policies thus gaining entitlement to unearned premiums. Such a course of events was of questionable certainty at the time the monies were advanced and indeed at all times up until the bankruptcy itself. The rights of the financier in such a situation at the time of the

filing of debtor's petition are accordingly more in the nature of an expectancy or a fortuity than a tangible property right. Property, to paraphrase Mark Anthony's speech in *Julius Caesar*, should be made of sterner stuff. Moreover, it is obvious that a creditor cannot improve his position after the entering of the order of relief. His status is frozen at the point (and indeed in some cases, as with preferential transfers, may actually diminish) and he is helpless to improve his posture. The property which the premium financiers seek to recover was not in existence at the time of the filing of debtor's petitions. The property comes into existence when the policies are cancelled and until that time the premium financiers' bundle of rights is not cognizable as property.

Granted, the creditors enjoyed a "power" or "right" of considerable value absent the invocation of this Court's jurisdiction. Nonetheless, it is too obvious to require citation that power, privileges, or even "property rights" which are valid and enforceable outside the context of liquidation or debtor rehabilitation do not, necessarily, carry the same force or possess the same efficacy once the "charmed circle" of bankruptcy jurisdiction has been entered. Something as tenuous, amorphous, uncertain, and dependent upon future conduct as the entitlement to unearned premiums upon policy cancellation cannot carry the burden of rising to the level of those favored creatures known as secured creditors. Or at least they cannot, in the Court's view, in the present state of Arkansas law.

In summary, premium financiers lent money to the debtors and took as their so-called security a bundle of rights that are not property. The property in the debtor's estate is the insurance coverage which has been purchased from the insurance companies and which the debtors wish to retain. The insurance coverage is "property of the estate." *In Re O'Neill Enterprises, Inc.*, 2 B.C.D. 1745 (4th Cir. 1977). The premiums were paid to the insurance carriers before the Petition. The payments to the financiers are not premium payments, which could be administrative expenses, but rather are payments on a debt which is unsecured by any lien on "property" of the debtors. Only by undertaking that which § 362 forbids can Rebsamen and PFS realize anything cognizable as a "property" interest in which a security interest could lie.